UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

A.M., a minor, by and through her parent          :
and natural guardian, GRETCHEN              :
FORGIONE, and GRETCHEN FORGIONE       :
in her own right,                                               :
        Plaintiffs                                          :
                                         :
        v.                                                         :
                                         :
LANDSCAPE STRUCTURES, INC.,               :
        Defendant/Third-Party Plaintiff          :          CIVIL NO. 1:14-CV-1376
                                         :
        v.                                                         :
                                         :
CHAMBERSBURG AREA SCHOOL                :
DISTRICT, HAMILTON HEIGHTS                   :
ELEMENTARY SCHOOL, and GEORGE        :
ELY ASSOCIATES, INC.,                             :
        Third-Party Defendants                      :

*M E M O R A N D U M*

I.        *Introduction*

This action arises from injuries sustained by a minor child while playing on

playground equipment during recess at her elementary school.  Plaintiff Gretchen

Forgione is the adult parent of minor Plaintiff A.M.,[1] who, on June 8, 2010, was injured

while playing on a playground structure called a PlayBooster, specifically a component

known as a Track Ride.  Defendant and Third-Party Plaintiff Landscape Structures, Inc.

(Landscape) manufactures playground structures for children and manufactured the

PlayBooster and Track Ride at issue.  Third-Party Defendant Chambersburg Area School

District (Chambersburg) is a public school district in Franklin County, Pennsylvania that

---

[1] A.M. is now known by the initials A.F.  (See Doc. 1-1 at 12).  For consistency with the case
caption, we utilize her former initials "A.M." throughout this opinion.

operates Third-Party Defendant Hamilton Heights Elementary School (Hamilton Heights), where A.M. was enrolled at the time she was injured; both Chambersburg and Hamilton Heights (collectively, "School Defendants") purchased and installed the Track Ride, and maintained the premises of the elementary school playground where A.M. was injured. (Docs. 69, 79 & 81, School Defendants' SMF, ¶¶ 1-5, admitted by Landscape); (Docs. 54 & 58, Landscape SMF ¶¶ 8-9, admitted by Plaintiffs).

Before this court are two motions for summary judgment.  First, Landscape seeks summary judgment against Plaintiffs based on Pennsylvania's statute of repose, 42 Pa. Cons. Stat. § 5536, arguing that the PlayBooster and Track Ride are improvements to real property, that more than twelve years has passed since they were furnished to the School Defendants, and that Landscape is protected under the statute.  (Doc. 53 at 2-4). Second, the third-party School Defendants seek summary judgment against Landscape, arguing that they are entitled to judgment as a matter of law because there is insufficient evidence to support Landscape's claims against them.  (Doc. 68 at 4-5).  For the reasons that follow, we find that the statute of repose extinguishes Plaintiffs' claims and will therefore grant Landscape's motion.  Accordingly, we will dismiss as moot the School Defendants' motion, which stems from third-party claims for contribution and indemnity.

II.       *Procedural History*

On June 4, 2012, Plaintiffs filed a complaint in the Franklin County Court of Common Pleas against Landscape, alleging claims of strict products liability, negligence, and breach of warranties.  (Doc. 1-1 at 12-17).  On July 17, 2014, Landscape removed the case to this court based on diversity jurisdiction, 28 U.S.C. § 1332; Plaintiffs are residents of Pennsylvania and Landscape is a corporation with its principal place of business in

Minnesota.  (Docs. 1 & 1-1).  On January 29, 2015, Plaintiffs moved to join as a defendant George Ely Associates, Inc. (Ely), a Pennsylvania sole proprietorship that sold the Track Ride as an independent contractor and manufacturer's representative for Landscape.  (Doc. 13); (Doc. 67-1, Ely Dep. 6:22-16:25, Oct. 28, 2016 ("Ely Dep.")).  The following day, Landscape moved for leave to file a third-party complaint against the School Defendants based on their involvement in purchasing, installing, and maintaining the PlayBooster and Track Ride.  (Doc. 14).  Believing Plaintiffs' motion to join Ely to be an attempt to destroy diversity of citizenship, Landscape opposed the motion.  (Doc. 15 at 1-2).  Plaintiffs then proposed that Landscape add Ely as a third-party defendant.  (Doc. 18 at 2).  On March 30, 2015, we held a conference call to discuss the parties' positions.

On April 27, 2015, Landscape amended its motion for leave to file a third-party complaint, which we granted.  (Docs. 19 & 21).  On May 1, 2015, Landscape filed a third-party complaint against both Ely and the School Defendants, seeking to hold each liable for contribution and indemnity.  (Doc. 23).  Although not named in that complaint, Plaintiffs filed an answer asserting state law crossclaims against Ely and the School Defendants.  (Doc. 24).  On June 30, 2015, the School Defendants moved to dismiss Plaintiffs' crossclaims and sections of Landscape's third-party complaint.  (Docs. 28 & 29).  We denied the motion as to Landscape's third-party complaint, but granted the motion as to Plaintiffs' crossclaims, which we dismissed for lack of subject matter jurisdiction; we also *sua sponte* dismissed Plaintiffs' crossclaims against Ely for lack of subject matter jurisdiction.  (Doc. 41 at 8-10); (Doc. 42).  After close of discovery, Ely was dismissed as a third-party defendant following the filing of a stipulation of dismissal signed by all parties pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(ii).  (Doc. 73).

The remaining claims are Plaintiffs' claims against Landscape and Landscape's third-party claims against the School Defendants. On October 11, 2016, Landscape filed its summary judgment motion, arguing that Pennsylvania's statute of repose extinguishes Plaintiffs' claims. (Doc. 53). On December 9, 2016, the School Defendants filed a summary judgment motion, arguing that there is insufficient evidence to support Landscape's claims for contribution and indemnity against them. (Doc. 68). The motions are ripe for disposition.

III.     *Standard of Review*

Federal Rule of Civil Procedure 56 permits a court to enter summary judgment if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those "that could affect the outcome" of the proceeding, and "a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party." Lamont v. New Jersey, 637 F.3d 177, 181 (3d Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

A party moving for summary judgment has the initial burden of stating the basis for the motion and identifying those portions of the record—depositions, documents, affidavits, admissions, interrogatory answers, or other materials—that it believes demonstrate an absence of a genuine dispute of material fact. Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145 (3d Cir. 2004) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)); Fed. R. Civ. P. 56(c)(1)(A). "Although the initial burden is on the summary judgment movant to show the absence of a genuine issue of material fact, 'the burden on the moving party may be discharged by showing—that is, pointing out to the

district court—that there is an absence of evidence to support the nonmoving party's case' when the nonmoving party bears the ultimate burden of proof." Conoshenti, 364 F.3d at 140 (quoting Singletary v. Pa. Dep't. of Corr., 266 F.3d 186, 192 n.2 (3d Cir. 2001)).  In assessing whether the moving party satisfied its burden, "we do not engage in credibility determinations, and we view the facts and draw all reasonable inferences in the light most favorable to the nonmovant." Pearson v. Prison Health Serv., 850 F.3d 526, 533 (3d Cir. 2017) (citations omitted).  "It is well settled that only evidence which is admissible at trial may be considered in ruling on a motion for summary judgment." Countryside Oil Co., v. Travelers Ins. Co., 928 F. Supp. 474, 482 (D.N.J. 1995); see also Fed. R. Civ. P. 56(c)(2).

Once the moving party shows an absence of evidence to support the nonmoving party's claims, then the nonmoving party must rebut the motion with facts in the record and cannot rest solely on assertions in the pleadings.  Berckeley Inv. Grp. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006).  The nonmoving party must present affirmative evidence that must be adequate as a matter of law to sustain a judgment in its favor; the evidence must not be colorable, conclusory, or speculative.  Davis v. Pa. Tpk. Comm'n, 204 F. Supp. 3d 793, 800 (M.D. Pa. 2016) (citing Anderson, 477 U.S. at 249-50). If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate.  Celotex, 477 U.S. at 322.

*IV.*        *Background*

Judged against these legal guideposts, we review the facts and draw all reasonable inferences in a light most favorable to the nonmoving parties—Plaintiffs A.M. and Gretchen Forgione, and Third-Party Plaintiff Landscape.

*Transaction for Hamilton Heights' PlayBooster & Track Ride*

In May 1988, the School Defendants, apparently through their Parent-Teacher Association (PTA), sought to purchase a PlayBooster from Landscape through Landscape's manufacturer representative, George Ely, and his sole proprietorship, Ely Associates, Inc.  (Docs. 69, 79, & 81, School Defendants' SMF, ¶¶ 7-9, partially admitted by Landscape); (Doc. 53-2, Fitzpatrick Aff. ¶¶ 3-4); (Doc. 67-4, Peters, Jr. Dep. 14:6-17:2, Oct. 17, 2016 ("Peters Dep.")).  A PlayBooster is a "componentized metal play system" that combines ground-level and climbing events with overhead activities, and consists of mixing and matching combinations and configurations of various pieces of playground equipment.  (Doc. 53-2 at 71-95); (Doc. 67-2, Fitzpatrick Dep. 103:24-104:13, Oct. 18, 2016 ("Fitzpatrick Dep.").  A PlayBooster structure can include an array of equipment components, such as swings, slides, tunnels, bridges, ladders, triangular and rectangular platforms, or a Track Ride, among other options.  (Doc. 53-2 at 13-18, 20-49, 164-65).  The components are held together by clamps, connected by platforms, and cemented into the ground by posts.  (Doc. 53-2, 24-31); (Fitzpatrick Dep. 49:1-50:20, 103:24-104:13).  PlayBoosters can be "designed to meet any site or budget limitations," and, for each component, a purchaser can choose from "a variety of colors and materials for an individual[ized] look."  (Doc. 53-2 at 80).

In 1988, the typical practice for ordering a PlayBooster, as described by George Ely, was that interested buyers would contact Ely, who would provide and review sales and product information with the buyer about the various structures manufactured by Landscape.  (Ely Dep. 27:20-29:1); (Fitzpatrick Dep. 12:2-15); (Doc. 53-2 at 71-170).  Ely might look at the playground site and meet with the buyers to acquire more information

about their specifications.  (Ely Dep. 28:5-14).  Ely and the buyer would pick a structure, such as the PlayBooster, develop a "wish list" that included the types and materials of the structure's components, and discuss the playground's site space layout and the buyer's budget.  (Ely Dep. 18:19-23:14, 26:12-28:22); (Fitzpatrick Dep. 9:20-10:4).  Ely communicated these specifications to Landscape, who then created a design drawing and price quote for the proposed structure.  (Ely Dep. 22:19-29:1, 49:1-50:20, & Ex. 1-2).

The record reveals the following details regarding the School Defendants' PlayBooster transaction.  On or about May 16, 1988,[2] the School Defendants selected from a list of available PlayBooster components offered by Landscape and a quote was prepared, which documented their request for an individualized PlayBooster with the following components: a firepole, vertical ladder, tunnel slide, corkscrew climber, several platforms and support posts, and a Track Ride.  (Ely Dep. 21:7-23:14 & Ex. 2-3); (Doc. 53-2 at 11-18); (Fitzpatrick Dep. 18:14-20:13).  On September 15, 1988, Ely and the School Defendants executed a purchase order for the PlayBooster.  (Doc. 53-2 at 4-11); (Ely Dep. 29:8-35:21 & Ex. 4); (Fitzpatrick Dep. 20:22-22:1).  On September 29, 1988, Landscape executed an order acknowledgement and created a "Plan/Custom" design drawing ("site plan drawing") of Hamilton Heights' PlayBooster,[3] which set forth the dimensions and layout of each of the structure's components.  (Doc. 53-2 at 4, 12); (Fitzpatrick Dep. 34:21-36:3).  Although it was typical in the transaction process, the record does not reveal

---

[2] There is also a quote in the record dated May 25, 1988.  (Ely Dep. Ex. 2-3).

[3] The unrebutted record evidence reveals that Landscape created the site plan drawing.  The drawing was produced by Landscape during discovery and George Ely denied creating it, stating instead that Landscape would have developed the drawing.  (Ely Dep. 18:19-19:16, 26:5-6).  Landscape's corporate designee and product compliance engineer also stated that "various parties," including Landscape, would have "had a part" in the drawing.  (Fitzpatrick Dep. 86:16-87:3).  There may have also been other design drawings created by Landscape before this date, but no other drawings are presented in the record.  (Ely Dep. 20:10-31:14).

discussions between the School Defendants and Landscape or Ely regarding the PlayBooster's specifications or its site space layout in developing the site plan drawing. (Ely Dep. 18:16-29:1); (Fitzpatrick Dep. 122:4-123:3).

In October 1988, Landscape manufactured and shipped the PlayBooster and its components to Hamilton Heights. (Doc. 53-2 at 6-9). The shipment included parts for each component, the site plan drawing, a sales catalog, and construction, installation, and maintenance guidelines (collectively "guidelines"). (Fitzpatrick Dep. 34:21-36:19, 104:14-107:24). Landscape's guidelines set forth eight-steps[4] for purchasing, installing, and maintaining playground equipment, and eleven-steps[5] for constructing the entire PlayBooster structure. (<u>Doc. 53-2 at 24-25 & 78-79</u>); (Fitzpatrick Aff. ¶¶ 5, 7). For each equipment component, such as the Track Ride, the guidelines included a list of parts, specifications, a pictorial assembly diagram, and installation instructions. (Doc. 53-2 at 26-49). The guidelines, which were periodically updated based on new component designs, provided instructions for maintaining each component and explained how to assemble and combine each component using clamps, platforms, and posts to form the entire PlayBooster structure. (53-2 at 24-70); (Fitzpatrick Dep. 133:18-140:12).

---

[4] This process included: choosing a playground designer—such as Landscape, who offered a "design service"—to plan the site space; selecting a manufacturer and qualified installer; selecting a safety surface; inspecting installation with a sales representative; implementing a maintenance and repair schedule; providing supervision of the play area; and replacing outdated equipment, when necessary. (Doc. 53-2 at 78-79).

[5] This process included: examining the site plan drawing; clearing and leveling a site for the PlayBooster; assembling the main structure and each equipment component; locating, digging, and pouring aggregate into holes for the PlayBooster's posts; pouring concrete into the holes when posts and platforms were at proper heights; connecting components to form the PlayBooster; installing safety surfacing material once concrete was set; and, finally, attaching play hardware—such as swings—before a final inspection of the installation. (Doc. 53-2 at 24-25).

On or around October 28, 1988, a common carrier delivered to Hamilton Heights the PlayBooster's components and parts, as well as Landscape's guidelines and site plan drawing. (Doc. 53-2 at 4-8); (Fitzpatrick Dep. 16:4-17:18, 22:6-25:21, 34:21-36:19); (Docs. 69, 79, & 81, School Defendants' SMF, ¶¶ 10-11, admitted by Landscape). Some time following delivery, members of Hamilton Heights' PTA constructed and installed the PlayBooster, including its Track Ride component; Landscape and Ely were not involved in construction, installation, or maintenance. (Ely Dep. 16:20-25, 38:1-46:14); (Fitzpatrick Dep. 25:22-28:7); (Doc. 67-3, Pryor Dep. 15:14-18:3, Oct. 17, 2016 ("Pryor Dep.")); (Docs. 69, 79, & 81, School Defendants' SMF, ¶¶ 12-13, admitted by Landscape). Since installation, the PlayBooster and its Track Ride component have not been moved or reconfigured. (Pryor Dep. 32:6-44:23, 63:15-64:8); (Peters Dep. 46:3-47:22); (Fitzpatrick Aff. ¶ 8); (Doc. 53-2 at 26-31); (Fitzpatrick Dep. 38:22-39:2, 128:14-19).

B.      *Design of Hamilton Heights' Track Ride*

A Track Ride is a PlayBooster component resembling a zip line, where children stand on a platform, grasp a handlebar on a trolley attached to an overhead beam, step off the platform, and, while holding the handlebar, glide above ground along a steel track to a platform on the other end of the beam. (Doc. 53-2 at 44-45 & 59-79); (Fitzpatrick Dep. 59:7-62:6, 104:10-13). According to Landscape's site specifications, the design of Hamilton Heights' Track Ride was such that it was affixed to two triangular platforms connected by an overhead beam, which spanned just over ten feet in length. (Fitzpatrick Aff. ¶ 6); (Doc. 68-11); (Fitzpatrick Dep. 59:7-62:6). The triangular platforms were fourteen inches above ground, and the distance from the platform to the overhead beam was seventy-eight inches. (Doc. 53-2 at 44-45). Accordingly, the total distance

from the top of the overhead beam to the ground—the "fall height"—was ninety-two inches.[6] (Fitzpatrick Dep. 63:8-64:19, 72:4-73:19, 129:1-5); (Fitzpatrick Aff. ¶ 6).

Although the anticipated use of Hamilton Heights' Track Ride was for users to begin riding while standing on a fourteen-inch triangular platform, its design was such that one of the triangular platforms was attached to a taller, "main structure" platform, which was forty-two inches above ground. (Doc. 68-5 at 66-69); (Fitzpatrick Dep. 82:4-15); (Doc. 68-11). A vertical ladder connected the triangular and main structure platforms, and a u-shaped hand loop helped children climb the ladder from the triangular platform to the main structure platform. (Doc. 68-11); (Fitzpatrick Dep. 79:22-83:18, 149:13-150:2). Because the main structure platform was adjacent—and in close proximity—to the Track Ride, children who were not tall enough to access the Track Ride from the designated triangular platform could access it using the main structure platform. (Doc. 68-5 at 69). To access the Track Ride in this manner, children could reach over the hand loop, grasp the Track Ride's handlebar, maneuver around the loop, and start riding from the main structure platform. (Doc. 68-5, A.M. Dep. 17:2-14, Ex. 2 Oct. 28, 2016 ("A.M. Dep.")).

C.      A.M.'s Fall

On June 8, 2010, Plaintiff A.M. was a first grade student at Hamilton Heights Elementary School and was playing on the PlayBooster during her lunch recess. (Docs. 69, 79, & 81, School Defendants' SMF, ¶¶ 25-26, admitted by Landscape); (A.M. Dep.

---

[6] This was a "general installation" height developed by Landscape after it observed children using prototype Track Rides during product development; Landscape did not consider the ages or heights of children at Hamilton Heights in developing the fall height. (Fitzpatrick Dep. 64:6-68:13, 74:20-75:4, 129:6-10). From 1985 to 1989, the fall height was ninety-two inches, but, in 1991 and 1992, the height was reduced to eighty-four inches, and a 1993 design made the height adjustable from seventy-six to eighty-six inches based on "age appropriateness." (Doc. 53-2 at 58-70); (Fitzpatrick Dep. 133:18-140:12). Hamilton Heights was not informed of these updated designs, and the record is unclear why the height was reduced. (Fitzpatrick Dep. 62:9-63:4, 129:11-32:22).

4:12). It does not appear that A.M. played on the Track Ride prior to this day, and, after watching other kids play on it, A.M. waited in line to ride. (A.M. Dep. 20:20-23:1, 42:2-23); (Doc. 68-4, Forgione Dep. 10:10-25, Oct. 28, 2016 ("Forgione Dep."); (Docs. 69, 79, & 81, School Defendants' SMF, ¶ 27, admitted by Landscape). A.M. tried accessing the Track Ride from the lower, triangular platform, but was too short to reach the handlebar. (A.M. Dep 22:2-9, 29:16-19). According to Landscape's product compliance engineer, if a child could not reach the handlebar from the triangular platform, they were not an intended user of the Track Ride. (Fitzpatrick Dep. 69:15-70:9, 77:9-84:15). A.M. then tried to access the Track Ride from the taller, adjacent main structure platform, which she had seen done by other students on previous occasions. (A.M. Dep 22:2-9, 26:8-11, 29:16-19, 31:17); (Docs. 69, 79, & 81, School Defendants' SMF, ¶¶ 27-28, admitted by Landscape).

A.M. leaned over the hand loop to grab the Track Ride handlebar from the main structure platform, but was hesitant to step off the platform. (A.M. Dep. 17:2-14, 24:14-25:2, 27:1-3, 43:5-44:18); (Docs. 69, 79, & 81, School Defendants' SMF, ¶¶ 28-30, admitted by Landscape); (Forgione Dep. 29:25-31:15). A.M. was "still considering" whether to ride when a fellow student in line behind her became impatient and pushed her off the platform. (A.M. Dep. 32:19-40:2, 43:5-14, 54:21-55:16). After being unexpectedly pushed, A.M.'s body swung around the hand loop and she glided above ground across the Track Ride. (Docs. 69, 79, & 81, School Defendants' SMF, ¶ 31, admitted by Landscape); (Forgione Dep. 9:7-24) (A.M. Dep. 26:18-27:17). A.M. reached the end of the Track Ride, but was too short for her feet to reach the platform on the other end to dismount. (A.M. Dep. 36:10-16). A.M. lost her grip on the handlebar due to sweaty hands, dropped onto the platform's ledge, and fell backward onto the ground, landing on

her right elbow. (Docs. 69, 79, & 81, School Defendants' SMF, ¶¶ 32-34, admitted by Landscape); (A.M. Dep. 37:7-40:12, 53:10-25).

A.M. was sent to the school nurse, was picked up from school and brought to a hospital by her mother, and was ultimately diagnosed with a broken elbow and referred for surgery. (Doc. 68-6, Altland Dep. 8:17-9:25, 11:11-14, Oct. 28, 2016 ("Altland Dep."); (Forgione Dep. 16:1-19:19, 29:25-31:15); (Docs. 69, 79, & 81, School Defendants' SMF, ¶¶ 35-43, partially admitted by Landscape); (A.M. Dep. 40:16). Surgery occurred the following day, during which "pins" and "screws" were implanted in A.M.'s arm; the following week, she was placed in an arm-length cast. (Forgione Dep. 19:23-23:4). A.M. did not return to school that year, and her cast and the implanted pins and screws were removed in August 2010. (Forgione Dep. 22:5-26:3, 35:4-18); (Docs. 69, 79, & 81, School Defendants' SMF, ¶¶ 44-45, admitted by Landscape).

D.      *School Defendants' PlayBooster Maintenance and Inspection*

Landscape's PlayBooster construction guidelines advised that because "falls are the most common playground accident," a resilient safety surface "must be provided under and around the PlayBooster." (Doc. 53-2 at 25, 71-95, 167); (Fitzpatrick Dep. 30:21-31:9, 90:7-91:15). The guidelines recommended an adequate fall absorbing surface for impact attenuation and to prevent head injuries.[7] (Docs. 69, 79, & 81, School Defendants' SMF, ¶¶ 15-16, admitted by Landscape); (Fitzpatrick Dep. 90:7-92:1, 118:17-

---

[7] The guidelines listed various surfacing materials tested by the Consumer Product Safety Commission, including: "loose materials such as sand or woodchips" that are "readily available and inexpensive" but "require frequent maintenance to maintain the proper/effective depth for maximum resiliency," as well as synthetic materials, such as rubber mats, which are costly but "more resilient" and require "less maintenance" than loose materials. (Doc. 53-2 at 78-79); (Fitzpatrick Dep. 119:19-120:15). The guidelines recommended a minimum six-inch depth when using woodchips, which is a depth recommendation that is consistent with the opinion of the School Defendants' grounds crew leader, David Pryor. (Doc. 53-2 at 25); (Pryor Dep. 38:9-39:11).

23). The School Defendants used woodchips as a protective surface underneath Hamilton Heights' PlayBooster, and their maintenance department was charged with maintaining the PlayBooster and its premises. (Pryor Dep. 6:12-13:13, 37:6-19); (Peters, Dep. 47:15-22). At the time of A.M.'s fall, the department's procedures for inspecting and maintaining the PlayBooster included a daily playground safety checklist, annual woodchip replenishment, and an annual equipment inspection. (Pryor Dep. 19:3-21:3).

The custodial staff at Hamilton Heights completed a daily inspection checklist of the PlayBooster and its premises. (Pryor Dep. Ex. 1). The checklist required staff to monitor various categories of playground safety, such as whether equipment was loose or broken, and whether there were sufficient woodchips underneath the equipment. (Id.) For each safety category, custodial staff marked whether it was "satisfactory" or "required attention." (Id.) The daily checklist completed by Hamilton Heights' custodial staff on June 7, 2010, the day before A.M.'s fall, reveals that all safety categories, including the adequacy of woodchips under the PlayBooster, were marked satisfactory. (Id.) The checklist, however, did not require documentation as to the depth of woodchips, and the record does not indicate the depth of woodchips underneath the PlayBooster in the time leading up to A.M.'s fall. (Peters Dep. 30:1-33:6); (Pryor Dep. 58:1-59:2).

The School Defendants also purchased woodchips on an annual basis for each of their playgrounds. (Pryor Dep. 31:14-33:18). Every summer, the maintenance department tilled and replenished the woodchips at their playgrounds, including Hamilton Heights' PlayBooster. (Docs. 69, 79, & 81, School Defendants' SMF, ¶¶ 17-18, partially admitted by Landscape); (Peters Dep. 17:8-20:20, 30:1-24, 34:13-35:22) (Pryor Dep. 65:10-22). The annual replenishing was "automatic," and a "stockpile" of woodchips was

preserved, from which the maintenance department would level off areas at playgrounds on an as-needed basis throughout the school year. (Pryor Dep. 33:21-36:17, 57:2-10); (Docs. 69, 79, & 81, School Defendants' SMF, ¶¶ 17-18, partially admitted by Landscape); (Peters Dep. 17:8-23:12, 30:1-31:6). The last replenishing of woodchips at Hamilton Heights' PlayBooster before A.M.'s fall was in the summer of 2009. (Pryor Dep. 69:20-72:1).

Finally, the School Defendants annually inspected the PlayBooster's equipment. The annual inspection, which contrasts with the six-month interval set forth in Landscape's guidelines, was conducted by the School Defendants' facility operations supervisor, Edward Peters, Jr. (Peters Dep. 9:21-10:21); (Fitzpatrick Dep. 97:1-8). Peters did not document his annual inspections,[8] and the record is unclear as to when Hamilton Heights' PlayBooster was last inspected in the time leading up to A.M.'s fall.

Peters, however, inspected Hamilton Heights' PlayBooster and its premises following A.M.'s fall. (Peters Dep. 4:20--7:14). Peters "deemed that [the Track Ride] was okay," and remarked that he "thinks" the depth of woodchips was between six or seven inches at the time that he measured. (Peters Dep. 8:2-16, 39:20-21). Peters did not document his inspection, but a December 2010 report by what appears to be the School Defendants' casualty insurance company detailed his findings:

> Peters indicated that he inspected the [Track Ride] after the incident and there was no defect in its operation that would have caused [A.M.'s fall] to have occurred. Site inspection of the [Track Ride] revealed the equipment was in very good condition and appeared to be functioning properly with no defect, damage, or deterioration. Similarly the ground beneath the zip line run appeared to be adequately mulched at the time of inspection.

(Pryor Dep. Ex. 3-4); (Peters Dep. 29:11-25, 36:18-39:2).

---

[8] Following A.M.'s fall, Peters now documents his findings, and the School Defendants conduct a monthly equipment inspection. (Peters Dep. 10:2-10, 23:16-24:24); (Pryor Dep. 22:8-24:10).

*V.*     *Discussion*

*A.*     *Landscape's Motion for Summary Judgment*

Landscape asserts in its motion for summary judgment that Plaintiffs' claims are barred by Pennsylvania's statute of repose, 42 Pa. Cons. Stat. §5536. (Doc. 55 at 9). We agree that the statute of repose applies to, and extinguishes, Plaintiffs' action because the PlayBooster and its Track Ride are improvements to real property that were furnished to the School Defendants almost twenty-four years before Plaintiffs' suit in this case, and because the unrebutted evidence reveals that Landscape performed and furnished the design of such improvements. Therefore, we will grant Landscape's motion.

A statute of repose commences "when a specific event occurs, regardless of whether a cause of action has accrued or whether any injury has resulted." Gilbert v. Synagro Cent., LLC, 131 A.3d 1, 14-15 (Pa. 2015) (quoting Abrams v. Pneumo Abex Corp., 981 A.2d 198, 211 (Pa. 2009)). A statute of repose limits the time within which an action may be brought and "completely abolishes and eliminates a party's cause of action." Gilbert, 131 A.3d at 15 (citing Noll v. Harrisburg Area YMCA, 643 A.2d 81, 84 (1994)); City of Philadelphia v. City of Phila. Tax Review Bd. ex rel. Keystone Health Plan E., Inc., 132 A.3d 946, 952 (Pa. 2015) ("[S]tatutes of repose . . . extinguish a party's cause of action upon the expiration of the time period."). Normally, "statutes of repose are jurisdictional and their scope is a question of law for courts to determine." Gilbert, 131 A.3d at 15. However, there may be instances where the statute's applicability turns on the resolution of factual issues. Id. "In such cases, the facts relevant to jurisdiction are so intertwined with those relating to the merits of the action [that] the jurisdictional determination will necessarily involve fact finding." Id.

Pennsylvania's statute of repose, entitled "Construction projects," provides, in pertinent part:

> [A] civil action or proceeding brought against any person lawfully performing or furnishing the design, planning, supervision or observation of construction, or construction of any improvement to real property must be commenced within 12 years after completion of construction of such improvement to recover damages for:
>
> > (1) Any deficiency in the design, planning, supervision or observation of construction or construction of the improvement.
> >
> > (2) Injury to property, real or personal, arising out of any such deficiency.
> >
> > (3) Injury to the person or for wrongful death arising out of any such deficiency.
> >
> > (4) Contribution or indemnity for damages sustained on account of any injury mentioned in paragraph (2) or (3).

42 Pa. Cons. Stat. § 5536(a); see also Vargo v. Koppers Co., Eng'g & Const. Div., 715 A.2d 423, 425-26 (Pa. 1998) ("[B]oth Pennsylvania and federal courts have consistently held that [§ 5536] is a statute of repose.").  A party moving for summary judgment under this statute must satisfy three elements: "(1) what is supplied is an improvement to real property; (2) more than twelve years have elapsed between the completion of the improvements to the real estate and the injury; and (3) the activity of the moving party must be within the class which is protected by the statute." Noll, 643 A.2d at 84; McConnaughey v. Bldg. Components, Inc., 637 A.2d 1331, 1333 (Pa. 1994).

Here, because Landscape seeks summary judgment on its affirmative defense of the statute of repose, it bears the burden of proof at trial to satisfy these three elements, and therefore, at summary judgment, "must show that it has produced enough

evidence to support the findings of fact necessary to win." <u>El v. Se. Pa. Transp. Auth.</u> <u>(SEPTA)</u>, 479 F.3d 232, 237 (3d Cir. 2007) (footnote omitted).

1.   <i>The Track Ride is an improvement to real property</i>

First, Landscape must show that it furnished an improvement to real property. Where chattel or personalty is attached to real property, the object is considered an "improvement to real property" if it constitutes a fixture. <u>Noll</u>, 643 A.2d at 87. A fixture has three components: "(1) the relative permanence of attachment to realty; (2) the extent to which the chattel is necessary or essential to the use of the realty; and (3) the intention of the parties to make a permanent addition to the realty." <u>Id.</u> Courts "look to the objective intent of the parties when determining whether an object is a fixture," and consider several factors: the degree to which and manner in which the object is attached to real property; the ease of removing the object without damaging the real property; how long the object has been attached to the real property; whether the object is necessary or essential to the real property; and the conduct of the party and whether it evidences an intent to permanently attach the object to the realty. <u>Id.</u> at 88.

Here, Plaintiffs do not contest this element, and we find that Landscape has satisfied its burden at summary judgment and presented sufficient, unrebutted evidence that the PlayBooster and its Track Ride are improvements to real property. Landscape and Hamilton Heights intended the PlayBooster and its Track Ride to become a permanent addition to Hamilton Heights' playground site, as is evidenced by the fact that the structures have not been moved or reconfigured since their installation in 1988. The PlayBooster, including its Track Ride component, is not easily removable from the land, and is "anchored in concrete and imbedded in the earth," where it has remained for more

than two decades.  See Schmoyer v. Mex. Forge, Inc., 621 A.2d 692, 694 (Pa. Super. Ct. 1993) (finding playground ride for children resembling carousel, called "Spin Around," to be improvement to real estate because it was "anchored in concrete and imbedded in the earth, where it remained for more than seventeen years"), rev'd in part, 645 A.2d 811 (Pa. 1994) (holding that, even if Spin Around was improvement to real property, its manufacturer was not of the class protected by statute of repose because it was a mass-produced product).  Based on these undisputed facts, and upon consideration of the factors set forth in Noll, 643 A.2d at 87-88, we conclude that the PlayBooster and its Track Ride are fixtures, and therefore constitute improvements to real property.

2.    *The Track Ride was installed more than twelve years ago*

Second, under Pennsylvania's statute of repose, an action to recover damages "must be commenced within [twelve] years after completion of construction" of the improvement to real property.  42 Pa. Cons. Stat. § 5536; Graver v. Foster Wheeler Corp., 96 A.3d 383, 387 (Pa. Super. Ct. 2014).  The twelve-year period begins to run "when the entire construction project is so completed that it can be used by the general public."  Noll, 643 A.2d at 84.  Here, it is undisputed that A.M.'s fall from the Track Ride occurred almost twenty-two years after it was manufactured by Landscape and installed at Hamilton Heights; specifically, the PTA installed the Track Ride around October 1988, and A.M.'s fall occurred in June 2010.  Plaintiffs did not file this action until June 2012, and, therefore, almost twenty-four years have passed since the installation of the PlayBooster's Track Ride and commencement of this action.  As such, because Plaintiffs commenced this action more than twelve years after completion of construction of the PlayBooster and its Track Ride, the statute of repose's second element has been satisfied.  (Doc. 67 at 2).

3.  *Landscape is in the class protected by the statute of repose*

Finally, Landscape must show that it falls within the class of persons protected by the statute of repose.  Landscape argues that it is protected under the statute because Hamilton Heights' PlayBooster and its Track Ride component were not mass-produced and because Landscape provided "individual expertise" in furnishing the design of the PlayBooster and Track Ride.  (Doc. 67 at 2-9).  In opposing Landscape's motion for summary judgment, Plaintiffs offer a host of interrelated arguments: (1) that Landscape is not protected by the statute because it only manufactured and shipped the PlayBooster and Track Ride, and "has not assembled, installed, or even provided instruction as to how to install the [PlayBooster and Track Ride]"; (2) that Landscape did not provide "any [individual] expertise as that performed by a builder"; and (3) that a genuine dispute of material fact exists because Landscape's prior admissions "belie the new recitation of its involvement" in designing the PlayBooster and its Track Ride.  (Doc. 57 at 5-11).

i.  *Landscape designed the PlayBooster and Track Ride*

By its terms, Pennsylvania's statute of repose "only protects the acts of those persons *involved*," McConnaughey v. Bldg. Components, Inc., 637 A.2d 1331, 1334 (Pa. 1994), in "lawfully performing or furnishing the *design*, planning, supervision or observation of construction, or construction of any improvement to real property," 42 Pa. Cons. Stat. § 5536(a) (emphasis added).  The statute "seeks to protect architects, builders, and similar professionals from claims for injuries where the deficiency in the design, planning, supervision, observation of construction and construction of improvement relates to real property and where the deficiency occurred long ago."  Ruben v. United States, 918 F. Supp. 2d 358, 362 (E.D. Pa. 2013) (citing Noll, 643 A.2d at 85-86

(statute passed through efforts of organizations of architects, engineers, and contractors "to protect these professions from suit long after improvements [are] completed")).

As a general rule, the statute does not apply to suppliers or manufacturers of products incorporated into an improvement to real property, but only to those involved in the building process. See Noll, 643 A.2d at 86. "[T]he clear and unambiguous language" of the statute "establishes that a manufacturer who does nothing other than supply a defective product which later is incorporated into an improvement to real property by others is not within the [statute's] purview." McConnaughey, 637 A.2d at 1334. The Pennsylvania Supreme Court has noted that "[a]pplication of [the statute] to manufacturers would cut the heart out of Pennsylvania product liability law by immunizing any manufacturing company fortunate enough to have its product turned into an improvement to real property." Noll, 643 A.2d at 86 (quoting Luzadder v. Despatch Oven Co., 834 F.2d 355, 359 (3d Cir.1987), cert. denied sub nom., Honeywell, Inc. v. Luzadder, 485 U.S. 1035 (1988)). In upholding the statute's constitutionality, the Court noted this distinction between manufacturers and those involved in the building process:

> Suppliers, who typically produce items by the thousands, can easily maintain high quality-control standards in the controlled environment of the factory. A builder, on the other hand, can pre-test his designs and construction only in limited ways—actual use in the years following construction is their only real test. . . . The Legislature can rationally conclude that the conditions under which builders work are sufficiently difficult that limitations should be placed on their liabilities, but not on the liabilities of suppliers.

Freezer Storage, Inc. v. Armstrong Cork Co., 382 A.2d 715, 719 (Pa. 1978). Applying this distinction, the Court has held that manufacturers of "mass produced product[s]," such as a piece of playground equipment resembling a carousel, are "not protected by the Pennsylvania 12 year statute of repose." Schmoyer, 645 A.2d at 811.

However, not all manufacturers are excluded as a matter of law from the class protected by the statute of repose. The statute "identifies its class not by the status or occupation of its members but rather by the contribution or acts done in relation to the improvement to the real property." McCormick v. Columbus Conveyer Co., 564 A.2d 907, 910 (Pa. 1989) (quoting Leach v. Phila. Sav. Fund Soc., 340 A.2d 491, 493 (Pa. Super. Ct. 1975)). In determining whether an entity is within the class of protected by the statute, courts focus on the activity performed by an entity. Noll, 643 A.2d at 86.

Here, it is undisputed that Landscape manufactured the PlayBooster and its Track Ride and was not involved in construction or installation of the structures. However, the summary judgment record also reveals that, much like an architect, Landscape designed the PlayBooster and Track Ride, and furnished guidelines to aid in their assembly, construction, and installation. Accordingly, we reject Plaintiffs' arguments that Landscape did not "even provide[] instruction as to how to install the [PlayBooster and Track Ride]," or that Landscape only manufactured and shipped the PlayBooster and Track Ride. The record does not support these arguments.

Even when taken in a light most favorable to Plaintiffs, the record contains abundant, unrebutted evidence that Landscape created and furnished a customized design of Hamilton Heights' PlayBooster. Hamilton Heights selected from various pieces of playground equipment offered by Landscape and requested an individualized PlayBooster with specifications as to the types, colors, and material makeup of each of the structure's components in its purchase order. (Doc. 53-2 at 10). Landscape "offer[ed] a design service as part of [its] sales support," (id. at 78), and developed a "Plan/Custom PlayBooster PlayStructure" site plan drawing, tailored to Hamilton Heights' order, (id. at

12).  The drawing was the design of Hamilton Heights' PlayBooster.  The drawing

presented the dimensions and layout of each component of the PlayBooster, established

where the PlayBooster's posts should be installed, and set forth how each component—

Track Ride, firepole, tunnel slide, etc.—should be connected to one another using

platforms of various heights to form the entire PlayBooster structure.  (Id.)  Notably,

Landscape's site plan drawing mirrors photographs of the PlayBooster's design as

installed at Hamilton Heights.  (Compare id. with Altland Dep. Ex. 1).

        The record's uncontroverted deposition testimony also supports Landscape's

involvement in designing the PlayBooster and its Track Ride component.  Landscape's

product compliance engineer stated that the PlayBooster "was custom designed

specifically for [Hamilton Heights] based on their specific wants, needs, and design

requests," and elaborated that "various parties," including Landscape, Ely, and the School

Defendants would have "had a part" in developing the design.  (Doc. 67-2, Fitzpatrick Dep.

4:11-10:4, 86:16-88:9).  Although the product compliance engineer started working for

Landscape in 2001, and was not personally involved in designing Hamilton Heights'

PlayBooster, his statements are confirmed by George Ely, who had personal knowledge

of Hamilton Heights' PlayBooster transaction.  (See id.)  Ely denied creating the site plan

drawing of the PlayBooster and stated that the design drawing "would have been done by

Landscape."  (Ely Dep. 17:14-25, 26:1-6, 27:2-29:4).  Ely confirmed that the transaction

followed a "customized process" to accommodate Hamilton Heights' order.  (Ely Dep.

17:14-19:16, 35:22-36:9).  The record plainly establishes that Landscape created the

PlayBooster's site plan drawing, and therefore undoubtedly "perform[ed]" the design of the

structure, including its Track Ride component.  See 42 Pa. Cons. Stat. § 5536(a).

Moreover, the record establishes that Landscape "furnish[ed]" the design of the PlayBooster and Track Ride to the School Defendants.  See id.  In addition to manufacturing and shipping the parts and site plan drawing of the PlayBooster to Hamilton Heights, Landscape also shipped construction, installation, and maintenance guidelines. (Fitzpatrick Dep. 34:21-36:19, 104:14-107:24); (Doc. 53-2 at 24-25 & 78-79).  These guidelines detailed step-by-step instructions to follow in constructing, assembling, installing, and maintaining the PlayBooster's components, including the Track Ride, and were provided to the School Defendants' PTA, who constructed and installed the PlayBooster.  As to the Track Ride, the guidelines contained a pictorial diagram of the component, listed its parts and specifications, and provided installation instructions, which detailed how to insert the trolley assembly into the steel beam and then attach the overhead beam to the PlayBooster's posts using clamps.  (Doc. 53-2 at 44-45).

Given these undisputed facts, Landscape has presented overwhelming evidence that it not only manufactured, but also designed, Hamilton Heights' PlayBooster and its Track Ride component.  The activities of Landscape in creating and furnishing the PlayBooster's site plan drawing and the Track Ride's assembly instructions show that Landscape was involved, much like an architect, in the building process, even if it did not participate in the actual construction or installation of the structure.  Landscape did not simply supply raw materials or a mass-produced product that happened to later be incorporated into an improvement to real property.  See McConnaughey, 637 A.2d at 1334.  Rather, the PlayBooster and Track Ride were the improvements to real property.

Because Landscape customized Hamilton Heights' PlayBooster to meet the School Defendants' specifications, the improvement was not a mass-produced product.

Although PlayBooster components, such as its Track Ride, may be mass-produced, we emphasize that Plaintiffs' claims do not challenge a mass-produced aspect of the Track Ride. Plaintiffs' claims do not arise from specific, detachable mass-produced parts, such as the Track Ride's handlebar, but stem from how Landscape incorporated the Track Ride into the PlayBooster's design. Here, Hamilton Heights' Track Ride was a component of, and "inextricably interwoven" into, its PlayBooster, and Landscape's customized design of the PlayBooster, specifically the manner in which the Track Ride was incorporated into the structure (i.e., its close proximity to a main structure platform that allowed A.M. to ride the Track Ride despite being too short to access it from the designated, triangular platform), was "uniquely suited" to Hamilton Heights. See McCormick v. Columbus Conveyer Co., 564 A.2d 907, 909-11 (Pa. 1989) (affirming summary judgment for manufacturer of belt conveyor, which was part of coal delivery system and "inextricably interwoven" into construction of new power plant, because manufacturer produced a product "uniquely suited to that site" and therefore did "more than supply a standard piece of equipment, indistinguishable from any other that it mass-produced").

ii. *Landscape provided "individual expertise" in designing the PlayBooster and Track Ride*

We also disagree with Plaintiffs that Landscape needed to perform acts of "individual expertise" as those performed by builders to fall within the class protected by the statute of repose. (Doc. 57 at 6). We acknowledge that the statute "was not intended to apply to manufacturers and suppliers of products, but only to the kinds of economic actors who perform acts of 'individual expertise' akin to those commonly thought to be performed by builders." Noll, 643 A.2d at 85 (quoting McConnaughey, 637 A.2d at 1334). However, although a manufacturer of an improvement to real property typically should

provide "individual expertise" of a kind performed by builders, the Pennsylvania Supreme Court has extended the reach of the statute of repose to manufacturers who provide "'individual expertise' to the design of an improvement." <u>Noll</u>, 643 A.2d at 86.

In <u>Noll</u>, a minor plaintiff filed suit against the manufacturer of starting blocks for injuries sustained after he dove into a swimming pool. <u>Id.</u> at 83. The trial court denied the manufacturer's motion for leave to amend its new matter to plead the statute of repose, finding that leave to amend would be futile because the starting blocks were not improvements to real property. <u>Id.</u> The Superior Court reversed and remanded for an evidentiary hearing, holding that whether the starting blocks were improvements to real property depended on the intent of the parties when the blocks were installed. <u>Id.</u> The Pennsylvania Supreme Court, however, agreed with the trial court and held that there was sufficient evidence to conclude that the starting blocks were not improvements to real property because they were removable and attached to the pool by bolts. <u>Id.</u> at 88-89. In dicta, the Court elaborated on the class of persons protected under the statute of repose. <u>See</u> <u>id.</u> at 89 (Cappy, J., concurring in judgment) (noting that because starting blocks were not improvements to real property, the Majority's discussion of statute of repose's third element "must be viewed as *dicta*").

In identifying the class protected under the statute of repose, the Court explained that the focus of the inquiry is on the "contribution or acts done in relation to the improvement of real property." <u>Id.</u> at 86 (quoting <u>McConnaughey</u>, 637 A.2d at 1334 n.3). The Court found that the starting blocks' manufacturer was of the class protected under the statute of repose based on the actions it performed. <u>Id.</u> The Court explained that although the starting blocks were a "standard product," the manufacturer examined

drawings of the pool's "unusual" deck to water height before shipping the blocks "per [the] drawing." Id. Under these "unique facts," the Court determined that the manufacturer was protected under the statute because it "evaluated the unique dimensions of the pool and determined that its product was appropriate" and therefore "expended 'individual expertise' and was involved with the design of the alleged improvement." Id. at 86-87. Over a concurring justice's criticism that the "individual expertise" provided by a manufacturer should be the "type of activity 'commonly thought to be performed by builders,'"[9] the Court extended the statute's reach to manufacturers who "expended individual expertise in supplying its product." Id. at 86 n.5. The Court noted, however, that "[w]ithout facts that indicate a manufacturer has actually *supplied such expertise in the design* or construction of an improvement along with its product, a manufacturer is not within the class protected by the statute." Id. (emphasis added).

Here, Plaintiffs argue that Noll "is not relevant to this action," and, relying mostly on federal court decisions preceding Noll,[10] assert that Landscape is not within the class protected under the statute of repose because it "did not offer any [individual] expertise as that performed by a builder." (Doc. 57 at 5-6). We reject this argument. As the Court in Noll made clear, the statute of repose extends to manufacturers who expend

_____

[9] See id. at 91 (Cappy, J., concurring in judgment) ("Under the facts presented here, [the manufacturer] merely *supplied a product, albeit* one within its 'individual expertise.' It did not provide the type of activity 'commonly thought to be performed by builders.' If we were to permit every manufacturer who, in performing its work, was required to meet specifications or to employ its 'expertise,' we would be expanding the protection of the statute of repose far beyond its acknowledged limits. . . . [T]he Majority has identified nothing at all 'unique' about the manufacturer's activity in this case. What was unique in this case was the *pool*; all the manufacturer did was ship a standard item 'per [the contractor's] drawing.'").

[10] (See Doc. 57 at 6-11 (citing Vasquez v. Whiting Corp., 660 F. Supp. 685, 689 (E.D. Pa. 1987), Beaver v. Dansk Industri Syndicat A/S (DISA), 838 F. Supp. 206, 213-14 (E.D. Pa. 1993), Fleck v. KDI Sylvan Pools, Inc., 981 F.2d 107, 114 (3d Cir. 1992))).

"individual expertise in supplying its product." <u>Noll</u>, 643 A.2d at 86 n.5. The unrefuted

facts show that a "customized process" was followed in ordering and designing Hamilton

Heights' PlayBooster, (Ely Dep. 17:14-19:16, 35:22-36:9), and that Landscape "custom

designed" the PlayBooster "specifically for [the School Defendants] based on their specific

wants, needs, and design requests," (Doc. 67-2, Fitzpatrick Dep. 4:11-10:4, 86:16-88:9).

Although it is unclear whether Ely or Landscape examined the playground site at Hamilton

Heights before doing so, Landscape created the "Plan/Custom" site plan drawing, which

was individually tailored to the PlayBooster ordered by Hamilton Heights. (Doc. 53-2 at

12). Accordingly, we find that Landscape, as a manufacturer and designer of playground

structures, provided sufficient evidence that it "expended 'individual expertise' in

supplying" and designing Hamilton Heights' PlayBooster and Track Ride such that it falls

within the class protected by the statute of repose. <u>See</u> <u>Noll</u>, 643 A.2d at 86 n.5.

iii. *No genuine dispute of material fact exists*

Because Landscape has supported its initial burden at summary judgment,

the burden shifts to Plaintiffs to "go beyond the pleadings and 'come forward with specific

facts showing that there is a genuine issue for trial.'" <u>Santini v. Fuentes</u>, 795 F.3d 410,

416 (3d Cir. 2015) (quoting <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S.

574, 587 (1986)). When a defendant meets his initial summary judgment burden of

demonstrating that no dispute of material fact exists regarding an affirmative defense, the

plaintiff "must then demonstrate with specificity the existence of a disputed material fact."

<u>Hutchinson v. Pfeil</u>, 105 F.3d 562, 564 (10th Cir.1997); <u>see also</u> <u>SEPTA</u>, 479 F.3d at 238.

"If the plaintiff fails to make such a showing, the affirmative defense bars [the plaintiff's]

27

claim, and the defendant is then entitled to summary judgment as a matter of law."
Hutchinson, 105 F.3d at 564.

Although the applicability of the statute of repose is normally a question of law for the courts, summary judgment may be inappropriate under the statute if a genuine dispute of material fact exists as to the involvement of a manufacturer in the planning, design, or construction of an improvement to real property.  See McConnaughey, 637 A.2d at 1335.  In McConnaughey, the plaintiffs purchased pre-fabricated roof trusses from a defendant-manufacturer and later incorporated the trusses into the construction of a barn.  Id. at 1333.  The plaintiffs used metal plates and wooden beams to connect the trusses to the barn, but the trusses were "not manufactured to the order or specification of the" plaintiffs.  Id.  Almost sixteen years after construction, the barn's roof collapsed and the plaintiffs filed suit against the trusses' manufacturer, who sought protection under the statute of repose.  Id.  The trial court granted partial summary judgment in favor of the manufacturer under the statute, apparently despite the parties' conflicting positions as to the manufacturer's involvement in installing the trusses.  Id. at 1333, 1335.  The Superior Court affirmed the trial court's decision.  Id.

The Pennsylvania Supreme Court, however, reversed and held that the statue of repose was enacted to protect builders, not actors who simply manufacture or supply a product later incorporated into a construction project.  Id. at 1334.  The Court determined that there was a genuine issue of material fact regarding the extent of the manufacturer's involvement in the installation or supervision of construction of the trusses, which was contested by the parties.  Id. at 1335.  In remanding the case, the Court noted that the plaintiffs "pleaded in their complaint that [the manufacturer] assisted in the design

and planning of the construction of the roof trusses into the real property," and that the manufacturer "denied participating in any of these activities in its answer." Id. at 1335 & n.5. The Court ignored the plaintiff's attempt to "use affidavits in order to supply factual allegations essential to avoid the statute of repose which were omitted from the initial pleading," and found that it was not an abuse of discretion for the trial court to find, "on the basis of the pleadings alone," that the manufacturer's involvement was disputed. Id.

Here, Plaintiffs argue that summary judgment should be precluded because there is a genuine dispute of material fact as to Landscape's involvement in designing the PlayBooster and Track Ride. (Doc. 57 at 11-12). Citing McConnaughey, Plaintiffs set forth a host of admissions by Landscape in this case, which Plaintiffs argue demonstrate disputes of fact as to Landscape's involvement in designing the PlayBooster and its Track Ride. (Doc. 57 at 3-5). Plaintiffs, however, do not point to any record facts that refute the documents or deposition testimony presented by Landscape regarding its involvement in designing the PlayBooster or Track Ride. Rather, Plaintiffs cite mostly to the pleadings— specifically Landscape's Answer (Doc. 4) to Plaintiffs' Complaint and Landscape's Third-Party Complaint (Doc. 23)—in asserting that Landscape's "prior statements and admissions belie the new recitation of its involvement."[11] (Doc. 57 at 9).

We find McConnaughey distinguishable from the instant case. Unlike Landscape's custom design of Hamilton Heights' PlayBooster, the roof trusses at issue in

---

[11] Landscape filed its summary judgment motion on October 11, 2016, relying mostly on an affidavit by its corporate representative and supporting documents. (Doc. 53). Depositions occurred between October 17, 2016, and October 28, 2016; Plaintiffs opposition brief was filed on October 31, 2016. This short period explains, but does not excuse, Plaintiffs relying mostly on the pleadings in opposing summary judgment. (Doc. 57). Landscape requested and received an extension to file its reply brief, in which it pointed to the aforementioned deposition testimony. (Docs. 59, 62, & 67). If Plaintiffs required more time to garner more facts in their briefing, they could have requested an extension of time or sought leave to file a sur-reply. They did neither.

McConnaughey were "not manufactured to the order or specification of the" plaintiffs. McConnaughey, 637 A.2d at 1333. Moreover, McConnaughey only held that the trial court did not abuse its discretion in determining, "on the basis of the pleadings alone," that the parties genuinely disputed the manufacturer's involvement in installing the trusses. Id. at 1335. By contrast, we "go beyond the pleadings" and look to the summary judgment record, which reveals that neither Plaintiffs nor Landscape genuinely dispute that Landscape designed the PlayBooster and its Track Ride. See Santini, 795 F.3d at 416.

Moreover, most of the purported admissions within the pleadings cited by Plaintiffs are undisputed and also do not address the precise issue at summary judgment: Landscape's involvement in *designing* the PlayBooster and Track Ride under the statute of repose.[12] A dispute of fact does not exist on these issues. The only specific, salient admission that Plaintiffs cite regarding Landscape's involvement in designing the PlayBooster and Track Ride is Landscape's Answer to the Complaint's allegation that Landscape was "in the business of designing and/or selling and/or supplying recreation equipment and was the seller or supplier of the defective Track Ride." (Doc. 57 at 5 (citing Doc. 1-1 ¶ 4)). In its Answer to that allegation, Landscape admitted to manufacturing the Track Ride, but denied "the remainder" of the allegation. (Doc. 4 ¶ 4). In opposing summary judgment, Plaintiffs cite to Landscape's Answer and argue that Landscape "denied that it designed the product," and therefore a genuine dispute of material fact exists for trial. (Doc. 57 at 3, 5, 8). Notably, Plaintiffs stop short of contending that Landscape did *not* design the PlayBooster or Track Ride.

---

[12] For example, Plaintiffs' briefing is replete with admissions by Landscape of undisputed facts: that Landscape manufactured the PlayBooster and its Track Ride and did not assemble, install, service, prepare or maintain the structure; that Ely was responsible for providing installation and maintenance guidelines for the structure; and that the School Defendants were responsible for the installation and maintenance of the playground structure. (Doc. 57 at 5 (citing Docs. 4 & 23)).

Here, although it is troubling that Landscape neither addressed this denial at summary judgment nor sought to amend its Answer in light of the evidence evinced during discovery, we nonetheless find that summary judgment is appropriate and that the general denial in Landscape's Answer to the Complaint does not create a genuine dispute of material fact for trial.  Initially, we note that it is not at all clear that Landscape denied designing the PlayBooster or Track Ride because of the inartful syntax of the Complaint's allegation and Landscape's general denial in its Answer.[13]  However, even assuming such a denial, we find that, in light of the entire summary judgment record, Plaintiffs do not *genuinely* dispute Landscape's involvement in designing the PlayBooster or Track Ride.

"A motion for summary judgment will not be defeated by 'the mere existence' of some disputed facts, but will be denied when there is a genuine issue of material fact." Am. Eagle Outfitters v. Lyle & Scott Ltd., 584 F.3d 575, 581 (3d Cir. 2009).  A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.  At summary judgment, our inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Post v. St. Paul Travelers Ins. Co., 691 F.3d 500, 514 (3d Cir. 2012) (quoting Anderson, 477 U.S. at 251-52).  To defeat summary judgment, the non-moving party may not rest upon mere allegations, speculations, unsupported assertions or denials of its pleadings, but must tender evidence of specific facts in the form of affidavits or admissible discovery material

---

[13] The text of Plaintiff's Complaint does not actually allege that Landscape designed the Track Ride or PlayBooster.  By its plain language, the Complaint makes two allegations: (1) that Landscape designs, sells, and/or supplies "recreation equipment"; and (2) that Landscape was "the seller or supplier of the defective 'Track Ride.'"  (Doc. 1-1 ¶ 4).  Due to this imprecise drafting, when Landscape generally denied "the remainder" of the allegation it could not have specifically denied designing the PlayBooster or Track Ride, but only denied designing recreation equipment.

that support its contention that a genuine dispute exists for trial.  See Connors v. Fawn Mining Corp., 30 F.3d 483, 489 (3d Cir. 1994).  The nonmoving party's evidence must present "reasonable—not fanciful or illusory—concerns with the moving party's evidence." SEPTA, 479 F.3d at 238 & n.7 ("Specious objections . . . will not defeat a motion for summary judgment, but real questions about credibility, gaps in the evidence, and doubts as to the sufficiency of the movant's proof, will.").

        In this case, Plaintiffs notably did not respond to, and do not appear to dispute, the deposition testimony, interrogatory responses, or documents supporting Landscape's admitted involvement in creating and furnishing the design of Hamilton Heights' PlayBooster and Track Ride.  (Doc. 67 at 2-6).  Plaintiffs do not tender any specific facts from discovery to show that Landscape did not design the PlayBooster or Track Ride.  Instead, Plaintiffs reach back to the pleadings and point to an inexact denial in Landscape's Answer to argue that summary judgment should be precluded.  In their briefing and statement of material facts, Plaintiffs do not assert that Landscape did not design the Track Ride, but only maintain that Landscape should not be permitted to reverse course from the vague denial in its Answer once discovery has occurred.  (Doc. 57 at 5); (Doc. 58, Plaintiffs' SMF ¶ 15).

        However, a party is "entitled to refine its [legal] theory at summary judgment based on evidence produced in discovery."  CMFG Life Ins. Co. v. RBS Sec., Inc., 799 F.3d 729, 743 (7th Cir. 2015).  "Litigants who must frame their claims before obtaining discovery often find it necessary to conform their theories to the facts as time goes on." Moriarty v. Larry G. Lewis Funeral Directors Ltd., 150 F.3d 773, 777 (7th Cir. 1998). "Abandoned theories fall by the wayside," and, "[a]lthough . . . a pleading sometimes may

be offered as evidence, a false step early in a case does not blot out the opportunity to prevail on a claim that is sound factually and legally." Id. at 778.

Here, the summary judgment record reveals that at every point since filing its Answer, Landscape has acknowledged designing the PlayBooster and Track Ride. Throughout discovery, and particularly in its interrogatory responses, Landscape admitted that it "would have *designed*, manufactured, packaged, sold, distributed, advertised and marketed" the PlayBooster and Track Ride. (Doc. 57-1 at 3 ¶ 1). Plaintiffs notably omit this interrogatory response from their summary judgment opposition brief, (see Doc. 57), and no record facts, aside from Landscape's initial Answer, support that Landscape would not have designed the PlayBooster or Track Ride. Any inconsistency between this interrogatory response and Landscape's initial Answer hardly necessitates a trial, especially when Plaintiffs do not contest the unrebutted evidence that Landscape designed the PlayBooster and its Track Ride. Cf. Pirant v. U.S. Postal Serv., 542 F.3d 202, 207 (7th Cir. 2008), as modified on denial of reh'g, (Dec. 3, 2008) ("[A]n inconsistency between the initial and amended pleading does not preclude summary judgment. That an amended pleading differs from the original is hardly surprising; that difference alone does not necessitate a trial.").

Plaintiffs do not contend, at any point, that Landscape did *not* design the PlayBooster or Track Ride; indeed, doing so would undermine their own defective design claims against Landscape. (See Doc. 1-1 ¶ 4). In raising the issue of Landscape's Answer, Plaintiffs attempt to maintain an untenable position at summary judgment by both suggesting that Landscape did *not* design the PlayBooster and Track Ride so as to preclude summary judgment on the statute of repose, while simultaneously asserting that

Landscape *did* design the PlayBooster and Track Ride for purposes of supporting their design defect claims. These contradictory positions reinforce to this court that Plaintiffs' purported dispute about the PlayBooster's and Track Ride's designs are disingenuous. Accordingly, we reject Plaintiffs' attempt to obfuscate the appropriateness of summary judgment in this case by relying on an ambiguous, general denial in Landscape's Answer, with which it does not actually disagree. In light of the overwhelming, unrebutted evidence produced during discovery, we find that a reasonable jury, taking the evidence in a light most favorable to Plaintiffs, would not be able to find in Plaintiffs' favor. As such, no genuine dispute of material fact exists about Landscape designing the PlayBooster or its Track Ride; therefore, the statute of repose extinguishes Plaintiffs' claims against Landscape. We will grant Landscape's motion for summary judgment.

      *B.*        *School Defendants' Motion for Summary Judgment*

"Ultimately, a court has the discretion to dismiss a third-party claim after the original claims of the plaintiff have been settled, and relegate the third-party plaintiff to a separate suit." Bjorgung v. Whitetail Resort, No. 1:03-CV-2114, 2007 WL 2906267, at *5 (M.D. Pa. Sept. 28, 2007). "[I]t is the rare exception when a court renders judgment in favor of the defendant but nonetheless chooses to address a third-party claim or related motion." Id. "The vast majority of courts, having found the defendant not liable, will simply dismiss the third-party claim and any related proceedings as moot." Id. (collecting cases).

Here, as we are granting Landscape's motion for summary judgment against Plaintiffs based on the statute of repose, thereby extinguishing Plaintiffs' action, we need not address the third-party School Defendants' motion for summary judgment. See Bjorgung v. Whitetail Resort, LP, 550 F.3d 263, 269 (3d Cir. 2008) (affirming dismissal of

two summary judgment motions, including one filed by third-party defendant, and agreeing "that these motions were rendered moot by the District Court's ruling that plaintiff assumed the risk and that the defendants owed [the plaintiff] no duty of care"). Accordingly, we will dismiss as moot the School Defendants' summary judgment motion against Landscape, which rests on Landscape's third-party claims for contribution and indemnity.

*VI.*        *Conclusion*

Because the PlayBooster and its Track Ride are improvements to real property that were installed at Hamilton Heights almost twenty-four years before Plaintiffs' suit in this case, and because the unrebutted evidence reveals that Landscape designed such improvements, we find that Landscape is within the class protected under Pennsylvania's statute of repose. Therefore, we will grant Landscape's motion for summary judgment. The claims in Plaintiffs' Complaint are extinguished. Accordingly, we will dismiss as moot the School Defendants' motion for summary judgment on Landscape's third-party claims for contribution and indemnity. We will issue an appropriate order.


/s/ William W. Caldwell
William W. Caldwell
United States District Judge


Date: May 19, 2017